# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# OXFORD DIVISION

**BOBBIE LOUIS SANDFORD**                                                         **PETITIONER**

**V.**                                                             **NO. 3:15-CV-190-DMB**
                                                                  **(NO. 2:12-CR-63-DMB-JMV)**

**UNITED STATES OF AMERICA**                                                      **RESPONDENT**

## ORDER OF RECUSAL

This civil action is before the Court for consideration of Bobbie Louis Sandford's 28 U.S.C. § 2255 motion. Doc. #44.

## I
## Procedural History

### A. Indictment, Plea, and Sentencing

In May 2012, Bobbie Louis Sandford was named in a five-count indictment charging two counts of wire fraud (Count One and Count Two), one count of money laundering (Count Three), and two counts of structuring transactions to evade reporting requirements (Count Four and Count Five). Doc. #1.[1] On October 17, 2012, Sandford pled guilty to Counts One and Three. Doc. #23.

Approximately a year later, on September 18, 2013, Sandford appeared before United States District Judge Sharion Aycock for sentencing. Doc. #30; Doc. #33. At the beginning of the sentencing hearing, Judge Aycock stated:

> Let me tell you that I have read the 35, 37 letters or so, and when I read the presentence report prior to the last hearing, when I saw the siblings listed, there was an Emma Cook with a Tupelo address, and I know an Emma Cook from Fulton, and -- but it didn't totally convince me that it was the same one because I associate her with being Fulton at least her business is in Fulton -- but I was -- thought it might be.

---

[1] Although this § 2255 action exists as an independent cause of action, all relevant documents were filed in the related criminal action (No. 2:12-cr-63). Unless otherwise specified, all record citations refer to the criminal docket.

When I get to the letters and read them, the letter is signed Robert and Emma Cook, and that was too great of a coincidence, because I knew that the Emma Cook I knew husband's name was Robert. And, in fact, he -- I have known him for a long, long time. He is -- he works there in Fulton at Mueller Brass. He has a lawn service, and he used to own a rental house next to my son's residence, and my son bought the rental house from Robert Cook.

About two weeks ago, after the sentencing hearing, one Sunday afternoon, Robert Cook knocks on my door, and Robert and Randy went to the door, comes to the back and tells me Robert Cook is there. Robert Cook is a great individual. Okay. I don't know his wife, the sister of the defendant.

Robert Cook is a member of a group in Fulton that we call the Fulton Community Volunteers, and every Saturday of the month, there is about 40 of us that weed-eat, trim sidewalks, plant flowers.

And in the last six months or so, he has been very much part of that group, so much so that the preceding Saturday prior to coming to my house, we had had a workday, and this past Saturday we had a workday, and on both occasions he is there, and we hug each other's neck, and we work side by side.

When he came to my house, I said, "Robert, I cannot talk to you about the case." And he said, "I was afraid you would tell me that." And I said, "I can't, but I want you to know that I sympathize with you and the family, because my sense is that the family, from reading the support letters, really -- doesn't really know the defendant's full history." And I said, "I sensed that. I may be wrong." He -- I said, "I cannot talk to you, but I would ask you to do this. Would you please come to the sentencing hearing so that you can hear some of the reasons given." And he said he would.

And he is the gentleman that is sitting back there. I think that is either Ms. Cook or Ms. Cook's -- I believe it's Ms. Cook sitting beside him, but I'm not sure, because I really don't know, because it's Robert that I see all of the time.

I asked him, really as just appeasing him and getting him out of the house as quickly as I could, would he and the family like to talk to probation after the sentencing to let them answer -- have answers to any questions that they had. I said, "I just think you'll have a better understanding of the gravity of the situation if you're here and you hear it firsthand." And he's here.

Robert -- Mr. Bobby Sandford has given them a picture that is -- that his violation today is a parole violation, that that is why he is in court. Unfortunate. So, understandably, when this thing got pretty involved last sentencing and some things about deaths and life insurance policies, I mean, the family is really now a bit bewildered, lost.

But still, as late as after the hearing the other day Bobby assures them, so Mr. Cook tells me, that this is all just blown up and blown out of proportion, that there is

2

> nothing to this.
>
> Now, I tell you that to tell you this. In my opinion, I didn't say anything to Robert Cook more so than "please attend the sentencing hearing and hear it in open court." And he's here. I did ask him if they wanted to talk to probation, that I would ask the probation officer if that -- if they were willing to sit down with family members.
>
> Danny McKittrick, Chief Probation Officer, is downstairs, and he is here prepared to sit with Kimberlee if they have any questions.
>
> You are welcome to talk to them. I encourage it. I'm just saying, in an effort of full disclosure, I honestly think that the family is victimized in this as well, because they just don't have a clue about the history of this defendant.
>
> I'm about to sentence him severely, and they are going to be shocked, displeased, surprised. No explanation will make it good. But if they want to ask questions, then I would like for them to have an opportunity to ask questions to probation.

Doc. #57-2 at 116–19. Judge Aycock then sentenced Sandford to 120 months imprisonment, approximately seventy months longer than the upper level of the range suggested by the Advisory Guidelines. Doc. #32; Doc. #33.

Sandford filed a notice of appeal on October 3, 2013. Doc. #34. The Fifth Circuit Court of Appeals affirmed the sentence and conviction on December 5, 2014.[2] Doc. #40; Doc. #41.

### B. Post-Conviction Motions

After the United States Supreme Court denied Sandford a writ of certiorari, Sandford filed the following motions: (1) a "Motion for Order Compelling Response to Request to Produce Legal Documents," Doc. #43; (2) an "Appellant's Pro-Se 28 U.S.C. § 2255 Motion," Doc. #44; (3) a "Motion for Bail Pending Appeal," Doc. #46; (4) a motion for bail, Doc. #49; (5) a motion for appointment of counsel, Doc. #50; (6) a motion to amend the § 2255 motion, Doc. #51; (7) a second motion for bail, Doc. #52; (8) a second motion for an evidentiary hearing, Doc. #60; and (9) a "Motion for Atty. Ross Barnett to Clear Sanford's Record," Doc. #61.

---

[2] On appeal, Sanford argued (1) procedural error based on the contention the district court did not explain the sentence, (2) the sentence was substantively unreasonable, and (3) the special condition regulating his use of computers did not reasonably relate to his offense and his history and characteristics. The Fifth Circuit rejected all of his arguments. Doc. #41 at 3–4.

3

On March 28, 2016, this Court issued an order denying the first motion for evidentiary hearing as premature. Doc. #55. On February 3, 2017, Sandford filed a motion seeking reconsideration of the denial of the evidentiary hearing. Doc. #64. Approximately three weeks later, on February 28, 2017, Sandford filed a motion for leave to appeal in forma pauperis. Doc. #68.

## II
## Recusal

In his § 2255 motion, Sandford argues he received ineffective assistance from Gregory Park, his trial counsel, because Park: (1) induced him to plead guilty by "failing to advise ... Sanford [of] potential affirmative defenses;" (2) "misrepresent[ed] ... the sentence he would receive;" (3) failed to challenge the indictment for wire fraud; (4) failed to challenge the indictment for money laundering; and (5) failed to move to recuse Judge Aycock after learning of Judge Aycock's connection to Sandford's family. Related to his final claim, Sandford also appears to raise a due process claim related to Judge Aycock's alleged bias. *See id.* at 25 ("Under the circumstances, Judge Aycock indicated she had foreclosed meaningful consideration of the evidence she was required to consider. The Judge demonstrated such a high degree of antagonism as to make fair judgment impossible."). As explained above, Sandford has requested an evidentiary hearing regarding these claims.

Pursuant to 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." While the statute does not require recusal merely because a judicial colleague is involved in a case, recusal may be appropriate when a judge would be called upon to assess the credibility of a judge of the same court. *See King v. Deputy Att'y Gen. of Del.*, 616 F. App'x 491, 494–95 (3d Cir. 2015) (collecting cases); *see also United States v. O'Brien*, No. 12-40026, 2014 WL 535663, at *1 (D. Mass. Feb. 6, 2014) ("Defendants advised that they intend to subpoena one or more of my colleagues on the United

4

States District Court to testify as witnesses at the trial, and that I will be required to recuse myself on that basis ...."). A similar rule applies where a judge would be required to assess the credibility of a person with whom she has worked closely. *See United States v. Ferguson*, 550 F.Supp. 1256, 1260 (S.D.N.Y. 1982) ("The mere fact of close relationship did not require disqualification. In this instance, however, credibility is a vital issue.").

To decide the misrepresentation claim, this Court would likely have to make a credibility determination as to testimony of Park or, at the very least, decide whether Park, who the undersigned works closely with in his capacity as a member of this District's CJA Committee, made a knowing misrepresentation to his client. As to the due process claim, this Court would have to decide whether, "objectively speaking, the probability of actual bias on the part of the judge ... is too high to be constitutionally tolerable." *Rippo v. Baker*, 137 S.Ct. 905, 907 (2017). This determination, in turn, would almost certainly require that this Court make a credibility determination regarding Judge Aycock's account of her conversation with Robert Cook, which has been challenged by Sandford. Under these circumstances, the undersigned concludes that her impartiality might reasonably be questioned and that, therefore, recusal is required. Accordingly, the undersigned **RECUSES** herself from this case. The Clerk of the Court is directed to transfer and re-assign this case to another district court judge.[3]

**SO ORDERED**, this 23rd day of June, 2017.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[3] Based on the described reason for recusal, and the undersigned's belief that all other district judges in this District may deem themselves disqualified for the same reason, in compliance with this Court's operating procedures for reassignment, the District's chief judge has been asked to contact the chief judge in another district with a request for reassignment of this matter. *See* L.U. Civ. R. 83.2.